Filed 4/8/14  In re Victoria G. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re VICTORIA G., a Person Coming Under the Juvenile Court Law. | |
| | D064906 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14619C) |
| v. | |
| GLORIA G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Neil R. Trop, under appointment by the Court of Appeal, for Minor.

Gloria G. appeals following the 12-month permanency hearing in the dependency case of her daughter, Victoria G. Gloria contends the juvenile court erred by ordering Victoria placed with her father, Victor P., and by not ordering regular visitation for Gloria. We affirm.

BACKGROUND

In April 2012, the San Diego County Health and Human Services Agency (the Agency) filed a dependency petition (Welf. & Inst. Code, § 300, subd. (b))[1] for one-year-old Victoria. The petition, as amended at the jurisdictional hearing, alleged that on April 2, the maternal grandmother tried to take Victoria's one-month-old sister, Grace G., from Gloria, and Gloria hit the maternal grandmother on the back with a purse. This occurred in the presence of Victoria's two siblings, aged three and four years old. Gloria had an extensive history of child welfare referrals.[2]

Approximately one week later, the Agency filed an amended petition, adding an allegation that Gloria admitted using amphetamine and methamphetamine since she was 12 years old[3] and while pregnant with Grace. Grace tested positive for amphetamine and methamphetamine at birth. Gloria acknowledged she was addicted, needed substance abuse treatment and her addiction interfered with her ability to supervise and protect Victoria.

---

[1]   All further statutory references are to the Welfare and Institutions Code.

[2]   Gloria had agreed to a voluntary case plan, but when a social worker visited her, Gloria was verbally abusive and threw an object at the door as the social worker left.

[3]   When this case began, Gloria was 24 years old.

Victoria's father had failed and had been unable to supervise and protect Victoria.[4]  The petition listed Alfredo T. as Victoria's alleged father.

Victoria was detained in a foster home.  At the detention hearing, the court struck Alfredo's name from the petition and added Victor as an alleged father.  In late April 2012, the court appointed counsel for Victor.  In May, Victoria was moved to a new foster home where she remained for the rest of the case.

In July 2012, the court granted Victor presumed father status.  The court made true findings on the amended petition, found it would be detrimental to Victoria to be placed with Victor and ordered Victoria placed in foster care.  The court ordered reunification services for Gloria and Victor.

The contested 12-month permanency hearing took place in October and November 2013.  At the conclusion of the hearing, the court terminated Gloria's services.  The court found "that there is not a substantial risk of harm to Victoria" and ordered "that physical custody of Victoria be restored to" Victor "and she be ordered placed with [Victor] pursuant to [s]ection 361[, subdivision] (a)."  The court directed the Agency to arrange Victoria's transition to Victor's home.  The court left intact the existing order for liberal supervised visits for Gloria and set a review hearing for May 6, 2014.

## PLACEMENT WITH VICTOR

At the contested 12-month review hearing, "the court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return . . . would create a substantial risk of detriment to the safety,

---

4       The Agency also filed petitions for Grace and for Victoria's other two siblings.  Victor is not the father of the siblings, and the siblings are not subjects of this appeal.

protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . ." (§ 366.21, subd. (f).)

Gloria contends the court erred by placing Victoria with Victor because he participated in services minimally and did not have a strong bond with Victoria. Citing section 366.21, subdivision (f), Gloria argues the finding that placement with Victor would not create a substantial detriment to Victoria's emotional well-being is unsupported by substantial evidence.

Before Victoria was born, Gloria alternately told Victor she was pregnant and denied being pregnant. Victor did not learn of Victoria's birth until a few hours after the fact. For the first nine months of her life, Victoria lived with Victor and the paternal grandmother in Escondido and Mexico. Victoria stayed with Gloria on weekends.

In April 2012, within two weeks after the dependency petition was filed, the Agency telephoned Victor. He immediately claimed paternity and said he wanted Victoria to live with him or the paternal grandmother. Victor said he had last seen Victoria two months previously, when the paternal grandmother had taken Victoria to Ensenada to see him. In early June, the Agency received a voice mail message from Victor, stating he was interested in visitation. In late June, the social worker left a telephone message for him. In September, the Mexican social services agency, Desarrollo Integral de la Familia (DIF) referred Victor to parenting classes. One week later, DIF scheduled an appointment with Victor. Victor told the Agency he went to the appointment, but "they were rude" and did not help him. He lost DIF's telephone number and was unable to obtain another appointment. Later, Victor told the Agency he had called for an appointment but was placed on hold.

In October 2012, Victor did not show up for a visit at the Mexican consulate near the international border. He later explained why. He lived in a remote area near Ensenada. He had to travel by bus approximately four to five hours to reach the border, and then spend the night in Tijuana for a visit the following day. He worked six to seven days a week, more than eight hours a day. In order to visit, he had to give his employer more than two weeks' notice and receive permission to take a day off. If he took time off, he could lose his job. It was difficult to make telephone calls to the United States.

The Agency heard nothing further from Victor until March 2013. At that time, the social worker asked Victor about scheduling a visit. Victor said he would need a week's notice. In May, Victor told the social worker he had not been able to contact her because his cell phone had been stolen. He said he would have to ask his employer what day he could visit. On two separate dates in early June, the Agency left messages for Victor.

By July 2013, Victor had completed parenting classes. That month, DIF evaluated Victor, his home and the relatives living with him. DIF recommended that Victoria be placed with Victor, based on an evaluation of the home and a background check.[5] The Agency recommended Victoria be placed with Victor with family maintenance services. In late July, the Agency and Victor agreed to a supervised visit, to take place at the border in August.

At the August 2013 visit, Victoria began interacting with Victor after about five minutes. Victor was attentive to Victoria and she called him "daddy." They sang and played games. They hugged at the end of the visit. Victoria smiled on the way back to the Agency's

---

[5] Victor acknowledged he had been on probation as a juvenile for possessing a deadly weapon. During the three-year probationary term, he had violated probation three times. Victor's probation ended around 2009.

office and showed no signs of anxiety. The foster mother testified that Victoria was clingy after the visit and said "that she wanted to see her grandma."

A second border visit, in September 2013, was attended by paternal relatives. Victoria appeared overwhelmed when she entered the visitation room and went straight to Victor, who hugged her. Victor introduced Victoria to the relatives and within five minutes she began interacting with them. Victoria and Victor played and sang, and she danced, laughed and smiled. They hugged and kissed at the end of the visit. Again, Victoria smiled on the way back to the Agency's office and showed no signs of anxiety, but the foster mother testified that Victoria was clingy.

In October 2013, Victoria had an overnight visit at Victor's home. The Agency's social worker, who accompanied Victoria, found Victor's home safe and appropriate. When Victoria and the social worker arrived at the home, Victoria smiled and ran to Victor with open arms. Victoria showed no hesitation in entering the home and paid no further attention to the social worker. When the visit ended, Victoria and Victor hugged and Victoria cried. On the way home, Victoria cried for 15 or 20 minutes and said she did not want to leave her daddy and the paternal grandmother. The foster mother reported that a couple of nights after the visit, Victoria began screaming in the middle of the night and asking to sleep in the foster parents' room. The foster family had moved to a new house one and one-half months earlier, and the social worker thought that might be the reason for Victoria's distress.

A foster family agency social worker, who also attended the October 2013 visit, agreed with the observations and recommendation of the Agency's social worker. The foster family agency social worker testified that Victoria was very engaged and affectionate with Victor. A

6

family liaison engagement worker, employed by a foundation involved in the child welfare system, also attended the visit. She agreed that the interaction between Victor and Victoria was loving and affectionate. She also believed the transition to Victor's home would be difficult for Victoria.

The Agency social worker, who observed Victoria's three visits with Victor, testified that Victoria recognized Victor as her father and they shared a loving relationship. They appeared to have a close bond. The social worker testified that initially, there would probably be a substantial risk of detriment to Victoria's emotional well-being if she were removed from the home of the foster parents, as she had considered them her parents for 18 months. This initial period would last days or weeks. In the long term, with services in place, Victoria would adjust, Victor would provide stability and the placement would not be detrimental.[6]

In October 2013, Victor, paternal relatives, and a DIF psychologist met to discuss ways of easing Victoria's emotional adjustment to Victor's home. The psychologist would remain available to assist Victoria, Victor and the paternal relatives. Victor was committed to receiving assistance from the psychologist and the DIF social worker. He wished for Victoria to receive any services that would help her, including therapy.

The above circumstances constitute substantial evidence (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 974) supporting the finding that placing Victoria with Victor would not

_____

[6]    Victoria was English speaking, and Victor also spoke English. The paternal aunt, who would provide day care until Victoria was old enough to go to school, spoke only Spanish. Four paternal relatives, at least three of whom lived near Victor, were bilingual.

create a substantial risk of detriment to her safety, protection, or physical or emotional well-being (*In re Joseph B*. (1996) 42 Cal.App.4th 890, 899).[7]

## VISITATION FOR GLORIA

Gloria contends the court erred by failing to order regular visitation. She argues the order placing Victoria with Victor in Mexico constituted a de facto termination of visitation.

In the juvenile court, Gloria did not object to the continuation of the existing visitation order, nor did she request a different order. Thus, she has forfeited her right to challenge the visitation order on appeal. (*In re Valerie A*. (2007) 152 Cal.App.4th 987, 1001.) In any case, there was no abuse of discretion. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319; *In re Alexandria M*. (2007) 156 Cal.App.4th 1088, 1095.)

Throughout this case, there was an order for liberal supervised visitation. For the most part, Gloria was allowed two visits per week. She was sometimes late and sometimes left

---

[7] The Agency asserts the governing statute is section 361.2, subdivision (a), which states: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." This section applies to an order of removal at the dispositional hearing. Although Victoria cannot literally be returned to Victor's custody, section 366.21, subdivision (f) most closely fits the circumstances here; it applies to a child placed in foster care, whose parent is participating in reunification services with the goal of having the child placed with that parent.

Under either statute, the result would be the same. In the juvenile court, the burden of proof under section 361.2, subdivision (a), is by clear and convincing evidence, and the burden of proof under section 366.21, subdivision (f) is by a preponderance of the evidence. However, "on appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' [Citation.]" (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 881, 880, quoted in *In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.)

visits early. In July 2012, the court gave the Agency discretion to lift the supervision requirement, and to allow overnight and weekend visits and a 60-day trial visit. Gloria never demonstrated the responsibility required for more frequent or expanded visits. Toward the end of the case, her attendance at visits was sporadic. The last visit took place in August 2013, more than two months before the hearing. In October, Victor and the paternal relatives discussed how to maintain Victoria's contact with her siblings and Gloria if Victoria began living with Victor. The paternal grandmother agreed to pick up Victoria in Mexico and bring her to Escondido for visits with Gloria and the siblings.

Victoria's appellate counsel points out that the certainty of a structured visitation schedule might benefit Victoria, and might lessen the chance of any disputes between Gloria and Victor concerning visitation conditions. At the next review hearing, the court should consider implementing a structured visitation plan, should the circumstances warrant.

DISPOSITION

The order is affirmed.

NARES, Acting P. J.

WE CONCUR:

McDONALD, J.

O'ROURKE, J.

9